**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Skatteforvaltningen, | Civil Action No. |
| Plaintiff, | **COMPLAINT** |
| vs. | **Jury Trial Demanded** |
| Luke McGee and 99 Cross LLC, | |
| Defendants. | |

Plaintiff Skatteforvaltningen ("SKAT"), by its undersigned counsel, alleges against Defendants Luke McGee ("McGee") and 99 Cross LLC ("99 Cross") (together, "Defendants") as follows:

1. Starting in or around 2012 and through at least 2015, Defendant Luke McGee perpetrated a sophisticated dividend withholding tax refund fraud on the Danish government, the results of which lined his pockets with tens of millions of dollars of fraudulent proceeds. In connection with his scheme, McGee utilized various limited liability companies to shelter his fraudulent proceeds from SKAT. Among these limited liability companies was Defendant 99 Cross LLC. McGee funneled approximately $1,500,500 into 99 Cross, then, in or about November 2014, caused 99 Cross to purchase a 5,475-square foot house located at 99 Cross Highway to Devon, Amagansett, New York (the "Hamptons Mansion") for $3,500,500, in part with the $1,500,500 in fraudulent proceeds. The remainder of the purchase was financed by a $2,000,000 mortgage from Choice Bank Belize, in which McGee was a part owner and which, in 2018, had its international banking license revoked.

2. When his fraud on the Danish government unraveled, McGee postured as if he would repay the money he stole in order to avoid a publicly filed lawsuit accusing him of wrongdoing. He, along with his co-conspirators, agreed to pay their net proceeds gained from the fraud back to Plaintiff SKAT. As a result, SKAT refrained from taking any legal action

against McGee.  In truth, from the outset of the Danish fraud, McGee was intent on sheltering his fraudulent proceeds, and surreptitiously worked to shield the proceeds of his fraud on the Danish Government and become judgment proof – which, as it is now clear to SKAT, he had done for years – to stymie SKAT's ability to enforce McGee's promise to pay back the net proceeds of his fraud.  In commencing this action, SKAT seeks, among other things, to avoid McGee's fraudulent transfer to 99 Cross.

3.      McGee defrauded Plaintiff SKAT, the agency of the government of Denmark charged with the assessment and collection of Danish taxes, of approximately $580 million. Between 2012 and 2015, McGee conspired with non-parties Matthew Stein ("Stein"), Jerome Lhote ("Lhote") and others, to use some 80 sham pension plans that submitted fake dividend credit advices to deceive SKAT into "refunding" supposedly withheld dividend tax that was never suffered, on dividends that the plans never received, on shares that the plans never owned. In 2021, Danish criminal prosecutors indicted McGee, Stein and Lhote for defrauding SKAT.

4.      To avoid detection, McGee and his co-conspirators spread approximately 1,300 individual refund applications across approximately 80 sham pension plans they set up expressly for this purpose.  To cover their tracks, the plans purportedly engaged in a complicated series of transactions around various Danish public companies' dividend dates designed to create the appearance that the pension plans owned large quantities of Danish stock, from which they received dividends net of withholding tax – but in fact the trades were completely fake.  The purported trades were merely circular, paper transactions that involved no delivery or actual ownership of any Danish shares.  This brazen fraud was at its heart very simple: the plans (which had no shares and no money to buy the shares) purported to buy shares from sellers who purportedly obtained the shares by borrowing them from the plans (which, again, had no shares

to start with).  This game of smoke and mirrors generated a confirmation record from regulated, but crooked, financial institutions that were intended to, and did, deceive SKAT into believing that the plans were real, held real shares, received real dividends, and actually suffered Danish tax that they were entitled to have refunded.

5.    McGee's fraud on the Danish government played out in two phases.  The first phase took place from 2012 to 2014, when McGee, Stein and Lhote conspired with Sanjay Shah ("Shah") and others to have Shah's Solo Capital Partners ("Solo Capital"), a brokerage business based in London, facilitate the fake trading scheme.  Solo Capital purported to act as a legitimate custodial financial institution, and issued fake "dividend credit advices" to McGee, Stein and Lhote's sham plans, which were used to deceive SKAT into paying withholding tax reclaim applications on the dividends that the plans never received on shares that the plans never owned. Using Solo Capital, McGee, along with Stein and Lhote, bilked SKAT for approximately $185 million dollars in this phase.

6.    In phase two of the fraud, McGee, Stein and Lhote severed their relationship with Shah and Solo Capital and set up a breakaway fraud scheme using their own privately held German bank, North Channel Bank, as well as two other broker-custodians.  Cutting out Solo Capital permitted McGee, Stein and Lhote to keep a much larger percentage of the fraudulently obtained refunds.  In 2014 and 2015, McGee, Stein and Lhote defrauded SKAT of a further approximately $395 million.

7.    In 2015, the Danish criminal prosecution service, SØIK, commenced an investigation into the dividend refund scheme.  In September 2019, North Channel Bank pleaded guilty in a Danish criminal court to a charge of serious criminal fraud in connection with the

-3-

breakaway fraud scheme.  The United Kingdom's Financial Conduct Authority has fined a number of brokers for executing transactions that facilitated the fraud.

8.      By 2017, it was clear to McGee that SKAT was intent on pursuing claims against him for the massive fraud he and others perpetrated against SKAT.  McGee and his co-conspirators entered a tolling agreement with SKAT and attempted to negotiate a settlement of SKAT's potential claims against them.  Ultimately those negotiations resulted in a May 28, 2019 settlement agreement with Stein, Lhote, McGee, and others to resolve SKAT's claims against them arising from the pension plans' fraudulent tax refund applications (the "Settlement Agreement").  Under the Settlement Agreement, McGee, along with Stein, Lhote, and others, agreed jointly and severally to pay a preliminary settlement amount to SKAT of approximately $225 million – an estimate of the Net Proceeds the settling parties received, directly or indirectly, from SKAT's payment of their fraudulent refund applications – subject to increase if the Net Proceeds were in fact more than that amount.  McGee, Stein, Lhote, and the other settling parties were obligated (and did) pay approximately $138 million of the preliminary settlement amount.  However, McGee, Stein, and Lhote were obligated to pay by May 28, 2023 the remaining unpaid preliminary settlement amount, which with certain interest and an adjustment to count the true value of the Net Proceeds, amounts to approximately $166 million.  In light of the Settlement Agreement, SKAT refrained from taking any legal action against McGee.

9.      In March 2023, Stein and Lhote commenced an action in the United States District Court for the Southern District of New York (the "SDNY Action") seeking, among other things, to avoid their obligation under the Settlement Agreement.  SKAT filed counterclaims against Stein and Lhote in the SDNY Action and impleaded McGee, asserting multiple breach of contract claims and seeking the approximately $166 million owed under the Settlement

Agreement as a result of Stein, Lhote, and McGee's breach. McGee sought to evade his obligation to SKAT under the Settlement Agreement by, among other things, joining the motion to dismiss SKAT's counterclaims Stein and Lhote filed in the SDNY Action (which motion was denied), asserting defenses that make clear his position that he is not obligated to pay SKAT anything, and claiming that the confession of judgment he executed for the amount of the settlement is now invalid and cannot be enforced.

10.    It is now clear that, since at least 2014, McGee has been fraudulently transferring the proceeds of his fraud with the intent to keep them beyond the reach of SKAT.

11.    McGee cannot be permitted to shelter his ill-gotten gains from SKAT. SKAT brings this action to restrain McGee and 99 Cross from disposing of the approximately $1,500,500, as well as any additional amounts, transferred to 99 Cross to purchase the Hamptons Mansion and to set aside McGee's conveyance of the approximately $1,500,500, and any additional amounts, to 99 Cross.

12.    SKAT has reason to believe that the fraudulent transfer to 99 Cross is not the only measure McGee has taken to make himself judgment proof, and respectfully requests the Court order McGee to provide an accounting of his proceeds from the fraud he perpetrated upon SKAT. Following judgment in the SDNY Action, SKAT will request that the Court order that SKAT may levy execution on the approximately $1,500,500, as well as any additional amounts that discovery reveals, transferred to 99 Cross and the Hamptons Mansion.

**PARTIES**

13.    Plaintiff SKAT is the agency of the government of Denmark charged with the assessment and collection of Danish taxes. SKAT is located at Hannemanns Allé 25, DK.2300 Copenhagen, Denmark.

14.     Defendant Luke McGee is a citizen of the United States and a citizen of Florida.

15.     Defendant 99 Cross LLC is a limited liability company organized under the laws of Delaware.  On November 13, 2014, McGee, as manager of 99 Cross, executed a mortgage in the amount of $2,000,000 with Choice Bank of Belize – a bank in which McGee was a part owner and which, in 2018, had its international banking license revoked – to purchase a 5,475-square foot house located at 99 Cross Highway to Devon, Amagansett, New York for a total of $3,500,500.  Upon information and belief, McGee is the sole member of 99 Cross.

## JURISDICTION

16.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(4) because the amount in controversy exceeds $75,000, exclusive of interest or costs, and it is between an agency or instrumentality of a foreign state, as plaintiff, and citizens of a U.S. state, as defendants.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District and a substantial part of the property that is the subject of this action is situated in this District.

## FACTUAL ALLEGATIONS

**McGee participated in a massive fraud on SKAT.**

18.     Over the course of 2012 to 2015, McGee participated in a massive fraud to deceive SKAT into paying approximately 4 billion Danish Kroner, approximately $580 million (US), in purported refunds of tax that was supposedly withheld at source from dividends that Danish companies issued their shareholders, but, which, in fact, was never withheld or owed in the first place (the "Danish Fraud").

###### i.    Overview of Danish Dividend Withholding Taxes and Refunds

19.    In the context of this case, dividend withholding tax is the deducting of taxes by a Danish company from a dividend payment due to a recipient prior to the payment of the dividend.  The dividend withholding tax that is deducted by the Danish company is then transferred to SKAT, the Danish tax authority.  Under the Danish Withholding Tax Act section 65, during the relevant period Danish companies were required to withhold 27% of the dividend they distributed on their shares to certain shareholders, including foreign shareholders.

20.    Shareholders resident outside Denmark may be entitled to a refund if the withheld tax exceeds the amount of tax owed according to a double taxation treaty between Denmark and the shareholder's country of residence.  A double taxation treaty between Denmark and the United States (the "Treaty") allows for a full refund of tax withheld on dividends paid by Danish companies to qualified U.S. pension plans, which are exempt from taxation.  In order to qualify for a full refund under the Treaty, a U.S. pension plan must have owned the shares for which the dividend is issued, have received the dividend, have suffered tax on the dividend, and must possess tax-qualified status under section 401(a) of the Internal Revenue Code.

21.    In order to receive a dividend refund, a U.S. pension plan was required to submit an application to SKAT representing that they owned the relevant Danish shares, received the relevant dividend on the shares, suffered dividend tax on account of that dividend, and were otherwise entitled to a refund.  A central requirement of the application was that a U.S. Pension Plan was required to submit a "dividend credit advice" from its broker-custodian representing that the pension plan held Danish shares, had received dividends on those shares, and had suffered tax on those dividends.  Additionally, a U.S. pension plan was also required to submit,

among other things, documentation from the Internal Revenue Service representing that they were qualified pension plans under the Internal Revenue Code.

### ii.    The Danish Refund Fraud

22.    Beginning in 2012, McGee, along with non-parties Stein and Lhote, and others participated in a fraudulent scheme to deceive SKAT into paying dividend tax refunds to sham U.S. pension plans that never held any Danish securities, received any dividends, or suffered any dividend withholding taxes.

23.    As part of the scheme, McGee, Stein, and/or Lhote created or caused others to create approximately 80 sham U.S. pension plans that submitted fraudulent dividend withholding tax refund applications to SKAT.  The sham plans, acting through payment agents, provided SKAT with the following documentation:

a.    a short cover letter addressed to SKAT in Taastrup, Denmark;

b.    a "Claim to Relief from Danish Dividend Tax" form, which set out:

i.   the identity of the U.S. pension plan representing that it owed the relevant shares and had received dividends net of withholding tax;

ii.   the amount of the tax refund application;

iii.   a certification that the U.S. pension plan was covered by the U.S. double taxation treaty with Denmark; and

iv.   the bank account to which SKAT should pay the refund application;

c.    a "credit advice" note or similar document purporting to describe the shareholding (or security), the amount of dividend purportedly received, and the amount of dividend tax withheld;

d.      a statement from the Internal Revenue Service on Form 6166, certifying

that each U.S. pension plan was (i) a trust forming part of a pension, profit

sharing, or stock bonus qualified under section 401(a) of the Internal

Revenue Code, (ii) exempt from U.S. taxation under section 401(a), and

(iii) a resident in the United States for purposes of United States taxation.

24.      Each of these documents contained representations and/or incorrect information that the conspirators knew or should have known were false and were intended to deceive SKAT into making a refund payment.  Specifically, the refund applications represented falsely that the pension plans owned Danish shares, on which the plans had received dividends, net of withholding tax, and that the plans were entitled to full refunds of the supposedly withheld tax under the Treaty.  In truth, the plans were not qualified U.S. pension plans for purposes of the Treaty, never owned the shares they claimed to own, never received any dividends from Danish companies in which they purported to be shareholders, never suffered any dividend withholding tax, and were not entitled to claim a refund of dividend withholding tax.  As a result of these false representations, SKAT paid refunds by bank transfer to the payment agents for the benefit of the plans.

25.      McGee conspired with others to cause 80 pension plans to submit approximately 1,300 fraudulent reclaims to SKAT.  These plans collectively defrauded SKAT of approximately DKK 4 billion (approximately $580 million).  Upon information and belief, McGee personally received approximately DKK 313 million (approximately $46 million USD) from the fraudulent scheme.  By November 13, 2014, McGee had defrauded SKAT of at least $140 million.  Upon information and belief, this amount exceeded the fair salable value of McGee's assets.

### iii.    McGee initially used Solo Capital Partners to facilitate the fraud

26.    The foundation of McGee and his co-conspirators' fraudulent refund scheme was the use of fraudulent dividend credit advices that would include false statements of Danish share holdings, dividends and suffered taxes.  These fraudulent dividend credit advices served as the basis of fraudulent refund applications that would be submitted to deceive SKAT into making refund payments to the sham pension plans that McGee and his co-conspirators had established.

27.    During the period from 2012 to 2014, McGee, Stein and Lhote entered into a conspiracy with Solo Capital, a U.K. entity at the time owned and controlled by Shah, through which Solo Capital would provide fraudulent dividend credit advices in exchange for a portion of the wrongfully obtained refund payment from SKAT.  During this time period, Solo Capital purported to serve as the custodian for 24 sham pension plans that McGee, Stein and/or Lhote created for the purpose of submitting their fraudulent tax refund applications to SKAT (three of which McGee was the sole participant in), and Solo Capital issued the false dividend credit advices that the plans included in their tax refund applications, despite the fact that neither the pension plans nor Solo Capital ever held any Danish shares, received any dividends, or suffered any withholding tax.

28.    In order to avoid detection and to perpetuate the fraudulent scheme, McGee and his conspirators, in coordination with Solo Capital, concocted a series of circular fake paper trades that would generate false documentation but never resulted in either the U.S. pension plans or Solo Capital ever having any Danish shares, receiving any dividends or paying any taxes.  As part of these obfuscation efforts, the pension plans first opened securities trading accounts at Solo Capital funded with little or no capital.

29.    After a Danish company announced it would pay a dividend to its shareholders, the plans purportedly purchased large amounts of shares in the Danish company from a broker identified by Solo Capital in an over-the-counter trade.  Solo Capital did not require the pension plans to pay any money to buy these alleged shares, nor could they as the pension plans had minimal, if any, actual capital.  In reality, no shares were ever actually purchased for the pension plans.  Instead, Solo Capital created a series of circular, paper transactions laundered through third party brokers that featured no delivery of Danish shares and no payment of cash to acquire shares: the plans (which had no shares and no money to buy the shares) purported to buy shares from sellers who, in turn, purportedly obtained the shares by borrowing them from the plans (which, again, had no shares to start with).  Based on the transactions in this looping shell game, Solo Capital issued the plans dividend credit advices stating that (i) the pension plans owned Danish shares, even though no Danish shares were ever received or held, (ii) the pension plans received dividends, even though no actual cash payments were ever received from a Danish company, and (iii) the pension plan suffered withholding tax on dividends, even though they never actually received a dividend, much less a dividend net of withholding tax.  After SKAT paid the money requested in the tax refund applications to the pension plans, the money was then distributed to other participants in the scheme through a series of transactions, involving in some circumstances multiple intermediaries.  The attempt to obscure the ultimate beneficiaries of the refund payment further demonstrates McGee and the other co-conspirators' fraudulent intent in perpetuating the fraudulent refund scheme.

30.    The United Kingdom Financial Conduct Authority ("FCA"), which regulated Solo Capital and other participants in the fraud, investigated the "trading" and to date has fined four of the brokers through which the "trading" was allegedly conducted.  One such broker was

Bastion Capital London LTD ("Bastion").  The FCA fined Bastion GBP 2.5 million for its role in

facilitating the fraud, and concluded:

> [T]he purported trading was a "circular pattern of extremely high value . . . equity
> trading, back-to-back securities lending arrangements and forward transactions," the
> purpose of which was to generate the false custodian statements that the plans submitted
> to SKAT.
>
> . . .
>
> The [FCA] refers to the trading as 'purported' as it has found no evidence of ownership
> of the shares by the Solo Clients, or custody of the shares and settlement of the trades by
> the Solo Group.  This, coupled with the high volumes of shares purported to have been
> traded, is highly suggestive of sophisticated financial crime.[1]

31.      SKAT filed civil cases in Dubai and England against Shah, Solo Capital, and

other entities owned or controlled by Shah.  SKAT obtained a civil judgment against Shah in

Dubai in the amount of approximately $1.25 billion.  SKAT's civil trial against Shah and others

in England began in April and is continuing.

32.      Danish prosecutors brought criminal charges against Shah, as they have done

against McGee, Stein and Lhote.  Shah was extradited to Denmark for his criminal trial, which

commenced in 2024.  In his civil testimony, Shah has confirmed that Solo Capital's "trading" in

Danish shares was a closed loop, and that Solo Capital in fact never held any Danish shares.

33.      Danish prosecutors likewise brought criminal charges against Shah's right-hand

man, Anthony Patterson.  Patterson pleaded guilty and admitted that the Solo Capital scheme

was a complete fraud.

---

1.   https://www.fca.org.uk/publication/final-notices/bastion-capital-london-ltd-2023.pdf.  To date, three other
     brokers have also been fined by the FCA and subject to similar criticism for their roles in facilitating the fraud
     on SKAT.  *See* https://www.fca.org.uk/publication/final-notices/sapien-capital-limited-2021.pdf;
     https://www.fca.org.uk/publication/final-notices/the-tjm-partnership-limited-formerly-known-as-neovision-
     global-capital-limited-in-liquidation-2022.pdf; https://www.fca.org.uk/publication/final-notices/sunrise-brokers-
     llp-2021.pdf.

iv.    **McGee and his co-conspirators move the fraud from Solo Capital Partners to their own North Channel Bank**

34.    McGee, Stein, and Lhote later split from Shah and joined a breakaway fraud scheme along with certain former employees and associates of Shah, including Graham Horn ("Horn"), a former Solo Capital employee and key player in the breakaway fraud. This fraudulent scheme followed the circular trading structure of the previous fraud conducted through Solo Capital, with the relevant distinction that a portion of the dividend credit advices would be issued by North Channel Bank, the institution owned by McGee and his co-conspirators.

35.    Since at least 2013, McGee, Stein, and Lhote have owned, through entities they controlled, a controlling interest in a German bank called North Channel Bank. As of 2018, McGee, Stein, and Lhote owned more than 93 percent of North Channel Bank.

36.    As part of the breakaway fraud scheme, McGee, along with Stein, and Lhote, developed a custody business at North Channel Bank to enable North Channel Bank to serve as purported custodian for sham pension plans. McGee, Stein, and Lhote then created new sham U.S. pension plans that would submit fraudulent tax refund applications to SKAT. North Channel Bank, along with two other new broker-custodians, served as a purported custodian of Danish shares for 56 new plans and issued the false dividend credit advices that the plans included in their tax refund applications to confirm falsely their fake trades and purported ownership of Danish shares. In truth, as with Solo Capital, North Channel Bank and other broker-custodians never held any shares on behalf of the 56 new plans as described in the credit advices and did not receive any dividends on those shares.

37.    The North Channel Bank chapter of the fraud followed the Solo Capital model closely. During the setup of the fraud at North Channel Bank, North Channel Bank management

-13-

raised questions to McGee, Stein, Lhote and others about the purported stock transactions. The responses, on which McGee, Stein, and Lhote were copied, make clear that the scheme was designed as a complete fraud from the start, because neither North Channel Bank nor any party to the trades was ever going to hold any shares or receive any dividends (or even any cash payments, other than the payment from SKAT). Yet, North Channel Bank nevertheless issued false dividend credit advices purporting to confirm that pension plans owned shares and received dividends, net of withholding tax. As with the Solo Capital chapter of the fraud, the North Channel Bank dividend credit advices were created in order to, and did, deceive SKAT into believing that the sham pension plans were entitled to a refund of withheld dividend tax.

38.    McGee had a lead role in setting up the custody business at North Channel Bank and knew that North Channel Bank "trading" was nothing more than a series of false book entries designed to deceive SKAT into believing that the pension plans owned shares and suffered tax on dividends on those shares, when in fact the parties to the "trading" never owned the shares they claimed to have owned, nor had the cash to purchase or borrow those shares, nor ever received any dividends. Just as in the Solo Capital fraud, the circular "trading" at North Channel Bank was nothing more than a loop in which the "seller" purported to sell shares it didn't own to a pension plan and covered the supposed short sale by borrowing from the pension plan the very shares it was allegedly selling it. In short, McGee knew that the scheme was a complete and utter fraud.

39.    After the intervention of BaFin, the German Federal Financial Supervisory Authority, North Channel Bank fired the management of the bank that was in place from 2013 through 2016. North Channel Bank's new management testified in 2021 that the bank had reviewed its records, including the Danish dividend credit advices, and determined that North

Channel Bank held no Danish shares for any of the plans, received no dividends, and that the dividend credit advices were "fictitious."  North Channel Bank now admits that the credit advices were fraudulently produced to show amounts deducted from the gross dividend as a withholding tax to be presented to SKAT and reclaim taxes that were never paid.  North Channel Bank also confirmed under oath that McGee – along with Stein and Lhote – were "deeply involved" in the set-up of the whole scheme, including introducing all the pension plans to North Channel Bank.

40.      On September 23, 2019, North Channel Bank pleaded guilty in a Danish criminal court to a charge of serious criminal fraud in connection with the breakaway fraud scheme.  In its plea, North Channel Bank admitted that it had received DKK 55 million from the refunds paid by SKAT and was ordered to pay a fine of DKK 110 million.

41.       On or around April 13, 2021, Danish prosecutors indicted McGee, along with Stein and Lhote, for his role in defrauding SKAT of approximately $580 million.  Upon information and belief, McGee, along with Stein and Lhote, will face trial in Denmark in 2025.

**McGee and others enter into a settlement agreement with SKAT.**

42.      On February 22, 2019, SKAT entered into a tolling agreement with McGee and others – which was extended numerous times – to toll the statute of limitations relating to the pension plans' fraudulent tax refund applications.

43.      On May 28, 2019, Stein, Lhote, McGee and others recruited by them to participate in the scheme entered into the Settlement Agreement with SKAT to resolve SKAT's claims against them arising from the pension plans' fraudulent tax refund applications.

44.      Under the Settlement Agreement, McGee, along with Stein and Lhote, agreed jointly and severally to pay to SKAT the Net Proceeds (as defined in the Settlement Agreement)

the settling parties received, directly or indirectly, from SKAT's payment of their fraudulent refund applications.

45.    As an estimate of the Net Proceeds, the Settlement Agreement established a preliminary settlement amount to be paid to SKAT of DKK 1.55 billion, subject to increase if the Net Proceeds were in fact more than that amount.  Under the Settlement Agreement, McGee, Stein, Lhote, and the other settling parties were obligated to (and did) pay DKK 950 million of the preliminary settlement amount within a few months of its effective date.

46.    McGee, Stein, and Lhote were obligated under the Settlement Agreement, as modified by a contemporaneously executed side letter, to pay the remaining DKK 600 million of the preliminary settlement amount no later than May 28, 2023.  Further, in the event any part of the DKK 600 million remained unpaid 24 months after the effective date, *i.e.*, on May 28, 2021, the Settlement Agreement entitles SKAT to 8.05 percent interest on the remaining unpaid amount starting from that date.  McGee, Stein, and Lhote were obligated to pay all such accrued interest, along with the remaining unpaid portion of the DKK 600 million, by May 28, 2023. Additionally, based on a "True-Up" process – a means of establishing the actual amount of the Net Proceeds – set forth in the Settlement Agreement, McGee, Stein, and Lhote were obligated to pay SKAT the True Up amount of DKK 108,603,074, and interest thereon, no later than May 28, 2023.

47.    The Net Proceeds that McGee, along with Stein and Lhote, are obliged to repay to SKAT under the Settlement Agreement are DKK 648,177,440, plus applicable interest.

48.    As a result of the Settlement Agreement, SKAT relied on McGee's representations that he would honor the Settlement Agreement and therefore did not commence any lawsuits against McGee.

49.     To date, McGee, along with Stein and Lhote, have paid SKAT only DKK 60,425,634 of the DKK 600 million balance of the preliminary settlement amount, and none of the True-Up amount or any accrued interest.

**McGee reneges on the SKAT Settlement Agreement.**

50.     Stein, Lhote, and McGee's obligation under the Settlement Agreement to pay SKAT DKK 648,177,440, plus accrued interest, was due on May 28, 2023.  On March 24, 2023, instead of meeting their obligation to SKAT, Stein and Lhote commenced the SDNY Action seeking, among other things, to avoid their obligation under the Settlement Agreement.  SKAT filed counterclaims against Stein and Lhote in the SDNY Action and impleaded McGee, asserting multiple breach of contract claims and seeking the over DKK 1,141,537,135 owed under the Settlement Agreement as a result of Stein, Lhote, and McGee's breach.  McGee has sought to evade his obligation to SKAT under the Settlement Agreement by, among other things, joining the motion to dismiss SKAT's counterclaims Stein and Lhote filed in the SDNY Action (which motion was denied), asserting defenses that make clear his position that he is not obligated to pay SKAT anything, and claiming that the confession of judgment he executed for the amount of the settlement is now invalid and cannot be enforced.

51.     The commencement of the SDNY Action made clear that McGee wrongfully induced SKAT to refrain from, among other things, further investigating and commencing the present action by entering into the Settlement Agreement.  Apart from taking affirmative steps to shield his assets and become judgment proof after entering into the Settlement Agreement, McGee, upon information and belief, entered into the Settlement Agreement to prevent SKAT from asserting the present claims during the applicable limitations period.

**McGee transfers his ill-gotten gains into 99 Cross to purchase the Hamptons Mansion.**

52.     From the commencement of the Danish Fraud, McGee understood the structure and fraudulent nature of the scheme.  SKAT's investigation into McGee revealed that, in order to maintain control over his proceeds of the Danish Fraud, McGee took steps to place his assets beyond the reach of SKAT.

53.      In or about November 2014, as part of these efforts, McGee, upon information and belief, transferred into 99 Cross for no consideration approximately $1,500,500 gained from McGee's massive fraud on SKAT.

54.     On November 13, 2014, McGee, through 99 Cross, purchased the Hamptons Mansion – a 5,475-square foot house located at 99 Cross Highway to Devon in Amagansett, New York – for approximately $3,500,500.  99 Cross purchased the home with the approximately $1,500,500 McGee transferred into it.  As part of the transaction, 99 Cross executed a mortgage in the amount of $2,000,000 with Choice Bank of Belize, a bank in which McGee was a part owner.  Approximately four years later, the Central Bank of Belize revoked Choice Bank Belize's international banking license and appointed a liquidator to carry-out the bank's affairs.[2]

55.     After 99 Cross's purchase of the Hamptons Mansion, McGee, upon information and belief, obtained possession of the Hamptons Mansion.

56.     Upon information and belief, McGee became insolvent as a result of the purchase of the Hamptons Mansion.

---

2.   Choice Bank Belize was reported to have "facilitate[d] wire activity for secretive clients operating in the world of offshore financing which present[ed] a higher risk for potential money laundering activities," and serviced individuals, such as adult entertainment webcam models, considered "high risk" by traditional banks.  *See* Gretchen Morgensen and Kit Ramgopal, *Secret documents reveal potential dark side of prepaid debit cards*, NBC NEWS (Sept. 22, 2020), https://www.nbcnews.com/business/consumer/secret-documents-reveal-potential-dark-side-prepaid-debit-cards-n1240332.

57.     Upon information and belief, McGee has insufficient assets to satisfy his joint and several obligation to SKAT.

58.     Following commencement of the SDNY Action, SKAT was diligent in its investigation of McGee.

### CAUSES OF ACTION[3]

### COUNT I

### (Constructive Fraudulent Transfer – N.Y. Debt. & Cred. Law § 273)

59.     SKAT repeats and realleges paragraphs 1 through 58 above as if fully set forth herein.

60.     At the time of the purchase of the Hamptons Mansion, McGee was defrauding SKAT in earnest.  McGee would later be obligated under the Settlement Agreement to repay SKAT the Net Proceeds of the Danish Fraud.  As such, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

61.     Upon information and belief, McGee transferred approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion.

62.     Upon information and belief, the approximately $1,500,500 transferred to 99 Cross constituted McGee's ill-gotten gains from the Danish Fraud.

63.     Upon information and belief, McGee was insolvent at the time of the transfer of approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion and/or the transfer rendered McGee insolvent.

---

3.   Because the fraudulent transfer at issue occurred in 2014, SKAT asserts its claims based on the New York statutory framework applicable in 2014.

64. Upon information and belief, McGee's transfer of approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion was made without a fair consideration and in bad faith.

65. As a result of the foregoing, McGee's direct transfer of approximately $1,500,500, and any additional amounts, into 99 Cross to purchase the Hamptons House qualifies as a constructive fraudulent transfer under applicable New York law.

## COUNT II

### (Constructive Fraudulent Transfer – N.Y. Debt. & Cred. Law § 275)

66. SKAT repeats and realleges paragraphs 1 through 65 above as if fully set forth herein.

67. At the time of the purchase of the Hamptons Mansion, McGee was defrauding SKAT in earnest. McGee would later be obligated under the Settlement Agreement to repay SKAT the Net Proceeds of the Danish Fraud. As such, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

68. Upon information and belief, McGee transferred approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion.

69. Upon information and belief, the approximately $1,500,500 transferred to 99 Cross constituted McGee's ill-gotten gains from the Danish Fraud.

70. Upon information and belief, McGee's transfer of approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion was made without fair consideration and in bad faith.

71.     In transferring approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion, McGee intended or believed that he would incur debts beyond his ability to pay as they matured.

72.     As a result of the foregoing, McGee's direct transfer of approximately $1,500,500, and any additional amounts, into 99 Cross to purchase the Hamptons House qualifies as a constructive fraudulent transfer under applicable New York law.

## COUNT III

### (Actual Fraudulent Transfer – N.Y. Debt. & Cred. Law § 276)

73.     SKAT repeats and realleges paragraphs 1 through 72 above as if fully set forth herein.

74.     At the time of the purchase of the Hamptons Mansion, McGee was defrauding SKAT in earnest.  McGee would later be obligated to under the Settlement Agreement to repay SKAT the Net Proceeds of the Danish Fraud.  As such, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

75.     Upon information and belief, the approximately $1,500,500 transferred to 99 Cross constituted McGee's ill-gotten gains from the Danish Fraud.

76.     Upon information and belief, McGee transferred approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion with the actual intent to hinder, delay, or defraud SKAT of funds that would be owed as a result of the Danish Fraud.

77.     Upon information and belief, McGee transferred for no consideration the approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion.

78.     Upon information and belief, after 99 Cross's purchase of the Hamptons Mansion, McGee obtained possession of the Hamptons Mansion.

-21-

79.     As a result of the foregoing, McGee's direct transfer of approximately $1,500,500, and any additional amounts, into 99 Cross to purchase the Hamptons Mansion qualifies as an actual fraudulent transfer under applicable New York law.

## COUNT IV

### (Reasonable Attorneys' Fees – N.Y. Debt. & Cred. Law § 276-a)

80.     SKAT repeats and realleges paragraphs 1 through 79 above as if fully set forth herein.

81.     At the time of the purchase of the Hamptons Mansion, McGee was defrauding SKAT in earnest.  McGee would later be obligated under the Settlement Agreement to repay SKAT the Net Proceeds of the Danish Fraud.  As such, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

82.     Upon information and belief, the approximately $1,500,500 transferred to 99 Cross constituted McGee's ill-gotten gains from the Danish Fraud.

83.     Upon information and belief, McGee transferred approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion with the actual intent to hinder, delay, or defraud SKAT of funds that would be owed as a result of the Danish Fraud.

84.     Upon information and belief, McGee transferred for no consideration the approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion.

85.     Upon information and belief, after 99 Cross's purchase of the Hamptons Mansion, McGee obtained possession of the Hamptons Mansion.

86.     As a result of the foregoing, SKAT is entitled to reasonable attorneys' fees in connection with this action.

## **REQUEST FOR RELIEF**

87.    WHEREFORE, Plaintiff SKAT requests that this Court enter judgment in its

favor against Defendants as follows:

88.    For Counts I through III:

a. A Court Order restraining Defendants from disposing of the approximately $1,500,500, and any additional amounts, transferred to 99 Cross and/or the Hamptons Mansion;

b. A Court Order setting aside McGee's conveyance of the approximately $1,500,500, and any additional amounts, to 99 Cross;

c. Following judgment in the SDNY Action, a Court order levying execution on the approximately $1,500,500, and any additional amounts, transferred to 99 Cross and the Hamptons Mansion; and

d. An accounting of the proceeds of the Danish Fraud.

89.    For Count IV:

a. Reasonable attorneys' fees.

90.    The costs of this action.

91.    All other and further relief that is just and proper.

-24-

Dated: New York, New York
     July 11, 2024

Respectfully submitted,

HUGHES HUBBARD & REED LLP

/s/ Marc A. Weinstein
Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
One Battery Park Plaza
New York, New York 10004-1482
(212) 837-6000 (t)
(212) 422-4726 (f)
marc.weinstein@hugheshubbard.com
neil.oxford@hugheshubbard.com
dustin.smith@hugheshubbard.com com

*Counsel for Plaintiff*
*Skatteforvaltningen (Customs and Tax*
*Administration of the Kingdom of*
*Denmark)*