**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Skatteforvaltningen,<br><br>Plaintiff,<br><br>*v.*<br><br>Luke McGee, 99 Cross LLC, the GLM Family Trust, and Kim Heneghan and Mark Talucci, *as trustees of the GLM Family Trust*,<br><br>Defendants. | No. 25-cv-02281 (NRB)<br><br>**SUPPLEMENTAL COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Skatteforvaltningen ("SKAT"), by its undersigned counsel, alleges against Defendants Luke McGee ("McGee"), 99 Cross LLC ("99 Cross"), the GLM Family Trust, and Kim Heneghan ("Heneghan") and Mark Talucci ("Talucci"), as trustees of the GLM Family Trust (collectively, "Defendants") as follows:

1. McGee is a judgment debtor who owes SKAT approximately $164 million for breaching a settlement agreement that resolved SKAT's civil claims against him stemming from a sophisticated fraud that he perpetrated against SKAT—the agency of the government of Denmark charged with the assessment and collection of Danish taxes—which lined his pockets with tens of millions of dollars of fraudulent proceeds. McGee, claiming that he is effectively judgment proof, has utilized various limited liability companies and trusts, including 99 Cross and the GLM Family Trust, in an attempt to place his assets beyond SKAT's reach and frustrate SKAT's efforts to enforce its judgment. Using 99 Cross and the GLM Family Trust, McGee, along with non-parties Gabrielle McGee and the LBM Family Trust, has undertaken a wave of transactions to try to ensure that 99 Cross and the property it holds—a 5,475-square foot house located at 99 Cross Highway to Devon, Amagansett, New York (the "Hamptons Mansion")

worth approximately $6.8 million—remain shielded from SKAT yet available for McGee's benefit.

2. Between 2012 and 2015, McGee and his co-conspirators, Matthew Stein ("Stein") and Jerome Lhote ("Lhote"), perpetrated a sophisticated dividend withholding tax refund fraud against the Danish government. In or about August 2015, McGee learned that SKAT was investigating the fraud and subsequently learned of a parallel criminal investigation by the Danish Public Prosecutor for Serious Economic and International Crime ("SØIK"). After the scheme unraveled, McGee postured as if he would repay the stolen funds in order to avoid a publicly filed civil lawsuit accusing him of wrongdoing, avoid joint and several liability for claims of $435 million, and in the hope that it would forestall criminal prosecution in Denmark. In May 2019, McGee, Stein and Lhote executed a settlement agreement with SKAT (the "Settlement Agreement") and committed to repay their net proceeds of the fraud. That promise proved hollow once Danish prosecutors charged and indicted McGee, Stein and Lhote in April 2021.

3. Two years later, in March 2023, Stein and Lhote sued SKAT in this Court (the "Maple Point Action"), seeking to evade their remaining obligations to SKAT under the Settlement Agreement. SKAT asserted counterclaims against Stein and Lhote, to which it joined McGee, alleging that they breached the Settlement Agreement and seeking to recover approximately $164 million owed to SKAT thereunder.

4. On September 22, 2025, following a bench trial, this Court in the Maple Point Action found in SKAT's favor on all counts and held McGee, Stein and Lhote jointly and severally liable for approximately DKK 1 billion. On October 9, 2025, the Clerk of Court entered judgment in SKAT's favor in the amount of $163,984,894.05 (the "Judgment").

5. It is now clear that McGee has spent years working to stymie SKAT's ability to enforce his promise to pay back the net proceeds of his fraud. To conceal his assets and try to place them beyond SKAT's reach, McGee utilized various limited liability companies and trusts, including 99 Cross, the GLM Family Trust, and non-parties Fresh Pond Investment LLC, 2321 Capital LLC, LBM DME Holdings LLC, the LBM Family Trust, and the 470 South Ocean Boulevard Trust. As a result of his shell games, McGee's wealth sits with his wife, Gabrielle McGee, purportedly beyond SKAT's reach.

6. In September 2014, while perpetrating his fraud on SKAT, McGee and his wife established 99 Cross. McGee funneled approximately $1,500,500 into 99 Cross which, upon information and belief, constituted fraudulent proceeds from his fraud on SKAT. Then, in or about November 2014, McGee caused 99 Cross to purchase the Hamptons Mansion—a 5,475-square foot house located at 99 Cross Highway to Devon, Amagansett, New York—for $3,500,500, in part, upon information and belief, with the $1,500,500 in fraudulent proceeds. The remainder of the purchase was financed by a $2,000,000 mortgage from Choice Bank of Belize, in which McGee was a part owner and which, in 2018, had its international banking license revoked.

7. [redacted]

8. From September 2014 through November 2025, McGee owned 50% of the membership interest in 99 Cross and acted as its manager. From September 2014 through at

least October 2021, Gabrielle McGee owned the remaining 50% membership interest in 99 Cross. In or about October 2021, Gabrielle McGee transferred her 50% membership interest in 99 Cross to Defendant GLM Family Trust; at that time, McGee maintained his 50% membership interest in 99 Cross. [redacted]

9. McGee cannot be permitted to shelter his ill-gotten gains from SKAT nor evade enforcement of the Judgment. SKAT brings this action to (1) restrain McGee and 99 Cross from disposing of the approximately $1,500,500, as well as any additional amounts, transferred to 99 Cross to purchase the Hamptons Mansion and to set aside McGee's conveyance of the approximately $1,500,500, and any additional amounts, to 99 Cross; (2) [redacted] (3) [redacted] (4) [redacted]

[redacted]; (5) obtain an order directing McGee to turn over the funds he funneled to 99 Cross to SKAT in partial satisfaction of the Judgment; and (6) obtain a declaration that 99 Cross is McGee's alter ego and that SKAT's Judgment may therefore be enforced against 99 Cross.

## PARTIES

10. Plaintiff SKAT is the agency of the government of Denmark charged with the assessment and collection of Danish taxes. SKAT is located at Hannemanns Allé 25, DK.2300 Copenhagen, Denmark.

11. Defendant Luke McGee is a citizen of the United States and a citizen of Florida. McGee currently owns 1% of the membership interest in 99 Cross and acts as that entity's manager. Upon information and belief, McGee exercises complete control over 99 Cross.

12. Defendant GLM Family Trust is a Delaware trust settled by Gabrielle McGee. Heneghan and Talucci are trustees of the GLM Family Trust with the power to manage and dispose of trust assets. [redacted]

13. Defendant Kim Heneghan is a trustee of the GLM Family Trust and a citizen of the United States and the State of New York. [redacted]

14. Defendant Mark Talucci is a trustee of the GLM Family Trust and, upon information and belief, a citizen of the United States and the State of New Jersey. [redacted]

[redacted]

15. Defendant 99 Cross LLC is a limited liability company organized under the laws of Delaware. McGee and the GLM Family Trust are 99 Cross's members. Accordingly, for purposes of diversity jurisdiction, 99 Cross is a citizen of Florida, New York and New Jersey. Upon information and belief, 99 Cross is McGee's alter ego. On November 13, 2014, McGee, as manager of 99 Cross, executed a mortgage in the amount of $2,000,000 with Choice Bank of Belize—a bank in which McGee was a part owner and which, in 2018, had its international banking license revoked—to purchase a 5,475-square foot house located at 99 Cross Highway to Devon, Amagansett, New York for a total of $3,500,500. 99 Cross remains the owner of the Hamptons Mansion.

## JURISDICTION

16. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(4) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between an agency or instrumentality of a foreign state, as plaintiff, and citizens of different U.S. states, as defendants.

17. Plaintiff commenced this action in the United States District Court for the Eastern District of New York on July 11, 2024. On March 10, 2025, pursuant to a stipulation between SKAT, McGee and 99 Cross, the Eastern District of New York transferred the action to this Court pursuant to 28 U.S.C. § 1404(a). The action, therefore, is properly pending in this District. Independently, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including the Maple Point Action, which resulted in the Judgment that McGee, 99 Cross and the GLM Family

Trust have sought to frustrate SKAT's ability to enforce. Alternatively, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because all defendants are subject to the Court's personal jurisdiction.

## FACTUAL ALLEGATIONS

### McGee's fraud on SKAT

18. From 2012 to 2015, McGee, Stein and Lhote engaged in a massive fraud on SKAT that involved U.S. pension plans submitting claims for refunds of taxes supposedly withheld at source from dividends that Danish companies issued to their shareholders (the "Danish Fraud").

19. Between 2012 and 2013, McGee, Stein and Lhote used Solo Capital Partners—a prime brokerage owned by Sanjay Shah—as the purported custodian for their pension plans. Solo Capital generated "dividend credit advices" falsely representing that the plans owned Danish shares, received dividends on those shares, and suffered withholding taxes on the dividends. The pension plans submitted those dividend credit advices to SKAT to support their fraudulent tax refund claims. Stein and Lhote's two primary business partners in this phase of the scheme conceded at a trial in this District before the Honorable Lewis A. Kaplan that the pension plans did not actually purchase any shares or receive any dividends, and so the refund claims were all false. As part of his fraud, McGee used 2321 Capital, as well as other entities he controlled, to sponsor pension plans that submitted fraudulent reclaims to SKAT.

20. In late 2013 or early 2014, McGee, Stein and Lhote split from the Solo Capital scheme and acquired North Channel Bank in Germany, which they used as purported custodian for their pension plans to generate additional false dividend credit advices to submit to SKAT. McGee had a key role in setting up North Channel Bank's custody business and knew that North Channel Bank's "trading" of Danish shares was nothing more than a series of false book entries

designed to deceive SKAT into believing that the pension plans owned shares and suffered tax on dividends on those shares, when in fact the parties to the "trading" never owned the shares they claimed to have owned, nor had the cash to purchase those shares, nor ever received any dividends. In short, McGee knew that the scheme was a complete fraud.

21. From 2014 through August 2015, McGee, Stein and Lhote introduced a new, larger group of pension plans as purported clients of their bank and caused North Channel Bank to generate the false tax refund claims that these pension plans submitted to SKAT.

22. Over the course of the fraud, McGee and his co-conspirators defrauded SKAT of approximately DKK 2.9 billion (approximately $435 million at the current exchange rate) in purported refunds for taxes never paid or owed.

**McGee learns of investigations into the fraud and enters the Settlement Agreement with SKAT**

23. In the summer of 2015, the U.K. government alerted SKAT to the fraud, prompting SKAT to halt all dividend withholding tax refund payments.

24. In August 2015, McGee learned from news reports that SKAT was investigating the fraud, and subsequently learned about a parallel criminal investigation by SØIK.

25. By 2017, aware of those civil and criminal investigations, McGee, Stein and Lhote approached SKAT to negotiate a settlement. Discussions continued through the end of 2018 and early 2019, at which point SKAT made clear that, despite McGee's, Stein's and Lhote's request, it would not condition a settlement on immunity from potential criminal charges in Denmark.

26. On May 28, 2019, McGee, Stein, Lhote and others executed the Settlement Agreement, resolving SKAT's civil claims against them relating to the fraud.

27. Under the Settlement Agreement, McGee, Stein and Lhote agreed jointly and severally to repay SKAT the "net proceeds" received from SKAT's payment of their fraudulent refund applications. The Settlement Agreement established a preliminary settlement amount of DKK 1.55 billion, subject to increase if the net proceeds were, in fact, more than that amount.

28. McGee, Stein, Lhote and other settling parties paid DKK 950 million of the preliminary settlement amount. McGee, Stein and Lhote were required to pay the remaining DKK 600 million, plus a true-up amount, by May 28, 2023.

**McGee and his co-conspirators are indicted in Denmark**

29. In September 2019, North Channel Bank (owned by McGee, Stein and Lhote) pled guilty in Denmark to serious criminal fraud for its role in creating the false dividend credit advices.

30. McGee, aware since 2017 of SØIK's criminal investigation into the fraud, was preliminarily charged in June 2020 and indicted in April 2021. Stein and Lhote were indicted along with McGee in April 2021. McGee, Stein and Lhote's criminal trial commenced in Denmark on June 2, 2026. McGee alone failed to appear for trial despite agreeing to do so, and, upon information and belief, an international warrant was issued for his arrest.

**McGee breaches the Settlement Agreement and is found liable following trial**

31. As noted above, McGee, Stein and Lhote's remaining payment obligation under the Settlement Agreement was due by May 28, 2023.

32. On March 24, 2023, instead of meeting their obligation to SKAT, Stein and Lhote commenced the Maple Point Action. SKAT asserted counterclaims against Stein and Lhote, to which it joined McGee, alleging that they breached the Settlement Agreement and seeking to recover over DKK 1 billion owed to SKAT thereunder.

33. On September 22, 2025, following a bench trial in the Maple Point Action, this Court found in favor of SKAT on all counts and held that judgment should be entered for SKAT on its breach of contract counterclaims against McGee, Stein and Lhote, jointly and severally, in the amount of approximately DKK 1 billion.

34. On October 9, 2025, the Clerk of Court entered the Judgment in SKAT's favor in the amount of approximately $164 million.

35. McGee's actions before and after the commencement of the Maple Point Action reveal that McGee never intended to honor his obligation to SKAT under the Settlement Agreement. Rather, since at least 2014 through the period leading up to the Settlement Agreement, and before and after the Maple Point Action, McGee took affirmative steps to shield his assets and become judgment proof to stymie SKAT's ability to enforce the Settlement Agreement and any judgment against him. Moreover, the commencement and litigation of the Maple Point Action made clear that McGee wrongfully induced SKAT to enter the Settlement Agreement. Apart from taking affirmative steps to shield his assets and become judgment proof before and after entering into the Settlement Agreement, McGee, upon information and belief, entered into the Settlement Agreement to prevent SKAT from, among other things, asserting its current claims regarding McGee's funneling of $1,500,500 to 99 Cross during the applicable limitations period.

**McGee transfers his ill-gotten gains into**
**99 Cross to purchase the Hamptons Mansion**

36. From the commencement of the Danish Fraud, McGee understood the structure and fraudulent nature of the scheme. In order to maintain control over his substantial wealth—built in part through his fraud on SKAT—McGee took steps to place his assets beyond SKAT's reach.

37. In or about September 2014, McGee created 99 Cross with his wife, Gabrielle McGee. At that time, and until in or about October 2021, McGee and Gabrielle McGee each owned 50% of the membership interests in 99 Cross. In October 2021, Gabrielle McGee transferred her 50% interest in 99 Cross to the GLM Family Trust. At all relevant times, McGee has acted as manager of 99 Cross.

38. In or about November 2014, as part of his efforts to place his assets beyond SKAT's reach, McGee transferred into 99 Cross for no consideration approximately $1,500,500 which, upon information and belief, he obtained from his fraud on SKAT.

39. On November 13, 2014, McGee, through 99 Cross, purchased the Hamptons Mansion—a 5,475-square foot house located at 99 Cross Highway to Devon in Amagansett, New York—for approximately $3,500,500. 99 Cross purchased the home with the approximately $1,500,500 McGee funneled into it. As part of the transaction, 99 Cross executed a mortgage in the amount of $2,000,000 with Choice Bank of Belize, a bank in which McGee was a part owner. In 2018, the Central Bank of Belize revoked Choice Bank of Belize's international banking license and appointed a liquidator to carry out the bank's affairs.[1]

40. After 99 Cross's purchase of the Hamptons Mansion, McGee obtained possession of the Hamptons Mansion. At all relevant times since November 2014, McGee has retained possession of the Hamptons Mansion.

---

1. Choice Bank of Belize was reported to have "facilitate[d] wire activity for secretive clients operating in the world of offshore financing which present[ed] a higher risk for potential money laundering activities," and serviced individuals, such as adult entertainment webcam models, considered "high risk" by traditional banks. *See* Gretchen Morgensen and Kit Ramgopal, *Secret documents reveal potential dark side of prepaid debit cards*, NBC NEWS (Sept. 22, 2020), https://www.nbcnews.com/business/consumer/secret-documents-reveal-potential-dark-side-prepaid-debit-cards-n1240332.

41. McGee's debts, including his liability to SKAT stemming from his fraud, exceeded the fair value of his assets when he funneled $1,500,500 to 99 Cross for the purchase of the Hamptons Mansion.

42. McGee has insufficient assets to satisfy his joint and several obligation to SKAT.

43. Following commencement of the Maple Point Action, SKAT was diligent in its investigation of McGee.

**McGee facilitates 99 Cross's satisfaction of the $2 million Choice Bank mortgage and** [redacted]

44. [redacted],[2] [redacted]

a. [redacted]

2. Upon information and belief, and at all relevant times, Heneghan, Talucci and McGee acted as trustees of the LBM Family Trust.

b. [redacted]

c. [redacted]

d. [redacted]

e. [redacted]

f. [redacted]

g. [redacted]

h. [redacted]

i. [redacted]

45. On October 18, 2024, the Suffolk County Clerk recorded the satisfaction of mortgage that the LBM Family Trust—through McGee and Talucci—executed on September 23, 2024. Since October 18, 2024, 99 Cross has held the Hamptons Mansion free and clear of any encumbrance.

46. [redacted]

[redacted] Upon information and belief, following this transaction McGee continues to retain possession and custody of the Hamptons Mansion.

47. The result of McGee, 99 Cross, the GLM Family Trust, Gabrielle McGee and the LBM Family Trust's shell game is that 99 Cross and the Hamptons Mansion sit with the GLM Family Trust, ostensibly beyond SKAT's reach.

48. McGee's debts, including his liability to SKAT stemming from his breach of the Settlement Agreement, exceeded the fair value of his assets [redacted]

49. McGee claims to have insufficient assets to satisfy his obligation to SKAT.

50. McGee and 99 Cross acted with the actual intent to hinder, delay and defraud SKAT [redacted]

51. McGee and the GLM Family Trust acted with the actual intent to hinder and delay SKAT's efforts to enforce the Judgment [redacted]

## CAUSES OF ACTION[3]

## COUNT I

**(Constructive Fraudulent Transfer – N.Y. Debt. & Cred. Law § 273)**
**(Against Defendants McGee and 99 Cross)**

52. SKAT repeats and realleges paragraphs 1 through 51 above as if fully set forth herein.

53. At the time of the purchase of the Hamptons Mansion, McGee was defrauding SKAT in earnest. McGee would later be obligated under the Settlement Agreement to repay SKAT the Net Proceeds of the Danish Fraud. As such, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

54. McGee transferred approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion.

55. McGee's debts, including his liability to SKAT stemming from his fraud, exceeded the fair value of his assets when he funneled $1,500,500 to 99 Cross for the purchase of the Hamptons Mansion.

56. Upon information and belief, McGee's transfer of approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion was made without fair consideration and in bad faith.

57. As a result of the foregoing, McGee's direct transfer of approximately $1,500,500, and any additional amounts, into 99 Cross to purchase the Hamptons Mansion qualifies as a constructive fraudulent transfer under applicable New York law.

---

3. Because the fraudulent transfer at issue in Counts I through IV occurred in 2014, SKAT asserts its claims in those Counts based on the New York statutory framework applicable in 2014. For all other Counts, SKAT asserts its claims based on New York's current statutory framework.

## COUNT II

**(Constructive Fraudulent Transfer – N.Y. Debt. & Cred. Law § 275)**
**(Against Defendants McGee and 99 Cross)**

58. SKAT repeats and realleges paragraphs 1 through 57 above as if fully set forth herein.

59. At the time of the purchase of the Hamptons Mansion, McGee was defrauding SKAT in earnest. McGee would later be obligated under the Settlement Agreement to repay SKAT the Net Proceeds of the Danish Fraud. As such, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

60. McGee transferred approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion.

61. Upon information and belief, McGee's transfer of approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion was made without fair consideration and in bad faith.

62. In transferring approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion, McGee intended or believed that he would incur debts beyond his ability to pay as they matured.

63. As a result of the foregoing, McGee's direct transfer of approximately $1,500,500, and any additional amounts, into 99 Cross to purchase the Hamptons Mansion qualifies as a constructive fraudulent transfer under applicable New York law.

## COUNT III

**(Actual Fraudulent Transfer – N.Y. Debt. & Cred. Law § 276)**
**(Against Defendants McGee and 99 Cross)**

64. SKAT repeats and realleges paragraphs 1 through 63 above as if fully set forth herein.

65. At the time of the purchase of the Hamptons Mansion, McGee was defrauding SKAT in earnest. McGee would later be obligated under the Settlement Agreement to repay SKAT the Net Proceeds of the Danish Fraud. As such, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

66. Upon information and belief, McGee transferred approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion with the actual intent to hinder, delay or defraud SKAT of funds that would be owed as a result of the Danish Fraud.

67. McGee, who owned 50% of the membership interest in 99 Cross and acted as 99 Cross's manager, had a close relationship to 99 Cross when he transferred approximately $1,500,500 to 99 Cross.

68. Upon information and belief, McGee's transfer of approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion was made without fair consideration and in bad faith.

69. Upon information and belief, McGee was aware of SKAT's right to the funds he defrauded from it when he transferred approximately $1,500,500 to 99 Cross and knew that he would be incapable of repaying the funds to SKAT.

70. After 99 Cross's purchase of the Hamptons Mansion, McGee obtained possession, use and control of the Hamptons Mansion.

71. As a result of the foregoing, McGee's direct transfer of approximately $1,500,500, and any additional amounts, into 99 Cross to purchase the Hamptons Mansion qualifies as an actual fraudulent transfer under applicable New York law.

## COUNT IV

**(Reasonable Attorneys' Fees – N.Y. Debt. & Cred. Law § 276-a)**
**(Against Defendants McGee and 99 Cross)**

72. SKAT repeats and realleges paragraphs 1 through 71 above as if fully set forth herein.

73. At the time of the purchase of the Hamptons Mansion, McGee was defrauding SKAT in earnest. McGee would later be obligated under the Settlement Agreement to repay SKAT the Net Proceeds of the Danish Fraud. As such, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

74. The approximately $1,500,500 that McGee transferred to 99 Cross consisted of McGee's ill-gotten gains from the Danish Fraud.

75. Upon information and belief, McGee transferred approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion with the actual intent to hinder, delay or defraud SKAT of funds that would be owed as a result of the Danish Fraud. 99 Cross, which McGee controlled and controls, received McGee's transfer with the actual intent to hinder, delay or defraud SKAT of funds that would be owed as a result of the Danish Fraud.

76. Upon information and belief, McGee's transfer of approximately $1,500,500 into 99 Cross to purchase the Hamptons Mansion was made without fair consideration and in bad faith.

77. After 99 Cross's purchase of the Hamptons Mansion, McGee obtained possession of the Hamptons Mansion.

78. As a result of the foregoing, SKAT is entitled to reasonable attorneys' fees in connection with this action.

## COUNT V

**(Constructive Fraudulent Transfer – N.Y. Debt. & Cred. Law § 273(a)(2))**
**(Against Defendants McGee and 99 Cross)**

79. SKAT repeats and realleges paragraphs 1 through 78 above as if fully set forth herein.

80. [redacted] SKAT had asserted claims against McGee in the Maple Point Action seeking to recover approximately $164 million that McGee owed to SKAT under the Settlement Agreement. As such, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

81. [redacted]

82. Upon information and belief, McGee transferred his right to receive [redacted] to 99 Cross without receiving reasonably equivalent value.

83. Upon information and belief, 99 Cross, which was and remains controlled by McGee, acted in bad faith in receiving McGee's [redacted]

84. In transferring his [redacted] to 99 Cross, McGee intended or believed that he would incur debts beyond his ability to pay as they matured.

85. As a result of the foregoing, McGee's transfer of his [redacted], and any additional amounts, to 99 Cross qualifies as a voidable transfer under applicable New York law.

**COUNT VI**

**(Constructive Fraudulent Transfer – N.Y. Debt. & Cred. Law § 274)**
**(Against Defendants McGee and 99 Cross)**

86. SKAT repeats and realleges paragraphs 1 through 85 above as if fully set forth herein.

87. When McGee transferred the [redacted] to 99 Cross, SKAT had asserted claims against McGee in the Maple Point Action seeking to recover approximately $164 million that McGee owed to SKAT under the Settlement Agreement. As such, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

88. [redacted]

89. Upon information and belief, McGee transferred his [redacted] to 99 Cross without receiving reasonably equivalent value.

90. Upon information and belief, 99 Cross, which was and remains controlled by McGee, acted in bad faith in receiving McGee's [redacted]

91. McGee was insolvent at the time he transferred his [redacted] to 99 Cross.

92. As a result of the foregoing, McGee's direct transfer of his [redacted] and any additional amounts, to 99 Cross qualifies as a voidable transfer under applicable New York law.

**COUNT VII**

**(Actual Fraudulent Transfer – N.Y. Debt. & Cred. Law § 273(a)(1))**
**(Against Defendants McGee and 99 Cross)**

93. SKAT repeats and realleges paragraphs 1 through 92 above as if fully set forth herein.

94. When McGee transferred the [redacted] to 99 Cross, SKAT had asserted claims against McGee in the Maple Point Action seeking to recover approximately $164 million that McGee owed to SKAT under the Settlement Agreement. As such, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

95. Upon information and belief, McGee transferred his [redacted] to 99 Cross with actual intent to hinder, delay or defraud SKAT in its efforts to recover the funds McGee owed to it under the Settlement Agreement.

96. Upon information and belief, 99 Cross, which was and remains completely controlled by McGee, acted in bad faith in receiving McGee's [redacted]

97. McGee transferred his [redacted] to 99 Cross, which, at the time of McGee's transfer, was an insider.

98. McGee retained possession of the Hamptons Mansion—owned by 99 Cross and subject to the $2,000,000 Choice Bank of Belize mortgage, [redacted]—following his transfer of the [redacted]

99. McGee concealed his transfer of the [redacted]

100. The Maple Point Action was pending when McGee transferred his [redacted]

101. Upon information and belief, McGee did not receive reasonably equivalent value from 99 Cross in exchange for his transfer of the [redacted]

102. McGee was insolvent when he transferred his [redacted]

103. As a result of the foregoing, McGee's direct transfer of his [redacted], and any additional amounts, to 99 Cross qualifies as a voidable transfer under applicable New York law.

**COUNT VIII**

**(Actual Fraudulent Transfer – N.Y. Debt. & Cred. Law § 273(a)(1))**
**(Against Defendants McGee, the GLM Family Trust, Heneghan & Talucci)**

104. SKAT repeats and realleges paragraphs 1 through 103 above as if fully set forth herein.

105. When McGee [redacted] to the GLM Family Trust, this Court had entered judgment in SKAT's favor against McGee for $163,984,894.05. As such, SKAT qualifies as a creditor, and McGee qualifies as a debtor.

106. McGee transferred his [redacted] to the GLM Family Trust with actual intent to hinder, delay or defraud SKAT in its efforts to enforce the Judgment.

107. The GLM Family Trust acted in bad faith in receiving McGee's [redacted]

108. McGee transferred his [redacted] to the GLM Family Trust, which is an insider.

109. McGee retained possession and control of 99 Cross following his transfer of his [redacted] to the GLM Family Trust.

110. McGee concealed the transfer of his [redacted] to the GLM Family Trust.

111. McGee transferred his [redacted] to the GLM Family Trust after he had been sued and after this Court entered the Judgment against him.

112. McGee removed and concealed [redacted] purportedly received in exchange for [redacted]

113. McGee was insolvent at the time he transferred his [redacted] to the GLM Family Trust.

114. McGee transferred his [redacted] to the GLM Family Trust approximately one month after this Court entered the Judgment against him.

115. As a result of the foregoing, McGee's direct transfer of his [redacted], and any additional amounts, to the GLM Family Trust qualifies as a voidable transfer under applicable New York law.

**COUNT IX**

**(Declaratory Judgment – Liability for the Judgment)**
**(Against Defendant 99 Cross)**

116. SKAT repeats and realleges paragraphs 1 through 115 above as if fully set forth herein.

117. SKAT obtained the Judgment against McGee in the Maple Point Action on October 9, 2025. The Judgment remains enforceable.

118. McGee [redacted] membership interest in 99 Cross and acts as 99 Cross's manager. McGee owned 50% of the membership interest in 99 Cross between September 2014 and November 2025 before [redacted] to the GLM Family Trust as part of his effort to frustrate SKAT's enforcement of the Judgment. Upon information and belief, 99 Cross is McGee's alter ego but disputes liability for the Judgment.

119. Upon information and belief, since its formation in or around September 2014, McGee has disregarded the corporate formalities of 99 Cross.

120. Upon information and belief, 99 Cross is, and has consistently been, inadequately capitalized.

121. McGee and 99 Cross share common office space, including the space located at 340 Royal Poinciana Way, Suite #317-418, Palm Beach, Florida 33480.

122. Upon information and belief, McGee makes all decisions on behalf of 99 Cross.

123. McGee's dealings with 99 Cross are not done at arm's length. For example, in or around November 2014, McGee transferred $1,500,500 to 99 Cross to purchase the Hamptons Mansion without receiving fair consideration. In 2024, McGee also transferred his [redacted] to 99 Cross without receiving fair consideration.

124. McGee regularly pays 99 Cross's bills, taxes and expenses using his personal bank account. For example, [redacted]

125. McGee has used his domination and control of 99 Cross to hinder, delay and defraud SKAT in its efforts to enforce the Judgment.

126. An actual, substantial controversy exists between SKAT and 99 Cross as to whether 99 Cross is McGee's alter ego and whether SKAT may pierce 99 Cross's corporate veil to enforce its Judgment.

127. SKAT, on one hand, and 99 Cross, on the other hand, have adverse legal interests with respect to this controversy.

128. The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment because SKAT seeks to enforce its Judgment against 99 Cross.

129. As a result of the foregoing, SKAT is entitled to a declaratory judgment against 99 Cross declaring that 99 Cross is in possession of McGee's assets, that 99 Cross is McGee's alter ego, that SKAT has pierced 99 Cross's corporate veil, and that SKAT may enforce its Judgment against 99 Cross as if it were McGee.

**REQUEST FOR RELIEF**

130. WHEREFORE, Plaintiff SKAT requests that this Court enter judgment in its favor against Defendants as follows:

131. For Counts I through III:

a. An order restraining McGee and 99 Cross from disposing of the approximately $1,500,500, and any additional amounts, transferred to 99 Cross and/or the Hamptons Mansion;

b. An order setting aside McGee's conveyance of the approximately $1,500,500, and any additional amounts, to 99 Cross; and

c. An order levying execution on the approximately $1,500,500, and any additional amounts, transferred to 99 Cross and the Hamptons Mansion.

132. For Count IV:

a. Reasonable attorneys' fees.

133. For Counts V through VII:

a. An order directing 99 Cross to pay the value of McGee's [redacted], and any additional amounts McGee transferred to it, to SKAT.

134. For Count VIII:

a. An order restraining McGee and the GLM Family Trust from disposing of McGee's [redacted], and any additional amounts, transferred to the GLM Family Trust;

b. An order directing the GLM Family Trust to pay the value of McGee's [redacted], and any additional amounts McGee transferred to it, to SKAT.

135. For Count IX:

a. A declaration that 99 Cross is in possession of McGee's assets, that 99 Cross is McGee's alter ego, that SKAT has pierced 99 Cross's corporate veil, and that SKAT may enforce its Judgment against 99 Cross as if it were McGee.

136. The costs of this action.

137. All other and further relief that is just and proper.

Dated: New York, New York
November 10, 2026

Respectfully submitted,

HUGHES HUBBARD & REED LLP

/s/ Marc A. Weinstein

Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
J. Scott Sanders II
One Battery Park Plaza
New York, New York 10004-1482
(212) 837-6000 (t)
(212) 422-4726 (f)
marc.weinstein@hugheshubbard.com
neil.oxford@hugheshubbard.com
dustin.smith@hugheshubbard.com
scott.sanders@hugheshubbard.com

*Counsel for Plaintiff Skatteforvaltningen (Customs and Tax Administration of the Kingdom of Denmark)*